The next case on the oral argument calendar is Rupailla Castro v. Bondi, 24-1271. Sean Quirk Good morning, Your Honors, and may it please the Court. Sean Quirk, on behalf of Petitioner Mr. Rupailla Castro, I'd like to reserve three minutes for rebuttal. Rupailla Castro Sure. Sean Quirk The agency denied Mr. Rupailla Castro the two pillars that make a hearing fair, his witness and his lawyer. Each violation independently requires remand. He exhausted the witness issue before the BIA, and the right to counsel claim is not subject to the usual exhaustion requirements. Starting with the first point, remand is necessary due to the IJ's failure to accommodate Petitioner's corroborating witness, Ms. Hilda Carmen Valdez-Valdez. The translated testimony of Ms. Valdez-Valdez was highly probative as it corroborated Mr. Rupailla Castro's persecution by Colonel Victor Julio Ramos and his brother, their efforts, quote, to do anything they could, end quote, to torture him in prison, and their effort to order him to be killed, because that's what they have done. I think — Mr. Carney Walk me through how this issue was exhausted. Sean Quirk Yes, Your Honor. This issue was exhausted — he was appearing pro se before the BIA, and so we construe his notice of appeal to the BIA liberally. And his arguments do not have to be artful under Nalaska and Maya. He stated to the BIA that the IJ erred in invalidating his witness. He wrote, quote, the IJ was wrong in invalidating my witness testimony when he wasn't able to get a hold of her a second time, even though in the prior call she had given consistent and corroborating testimony of the evidence I had submitted, end quote. Mr. Carney Walk Okay. So I mean, clearly he's exhausted something. Sean Quirk Yes. Mr. Carney Walk The question is, are you making a different argument about whether the rules for witnesses were provided in a foreign language that your client didn't understand? Because that part of it I question whether it was exhausted, even giving the liberal construction to the notice of appeal for a pro se client. Sean Quirk Yes, Your Honor. I understand. For the exclusion of the witness, we represent it's absolutely exhausted. Not only did he present this in his notice of appeal, but the BIA then ruled on it at AR3, explicitly addressing the invalidation, the exclusion of the witness argument, and it's properly before the court. Mr. Carney Walk Well, that's true. The BIA did address something. What is the scope of your argument then on this point? Because maybe that would be helpful. I understand you think the witness was not sufficiently regarded, cut off, other things like that. Is there more to your claim? Sean Quirk The witness here, Ms. Valdez-Valdez, fully corroborated his testimony. And so the argument is that the exclusion of her testimony was not fundamentally fair. Under ASHODI is the standard for whether a petitioner receives a fair hearing. Mr. Carney Walk Well, in what sense was the testimony excluded? I mean, she was able to provide some testimony, and wasn't it not considered? Sean Quirk It was not considered at all, Your Honor. The IJ completely Ms. Valdez-Valdez But, Counsel, I think that's because she wasn't available for cross-examination.  Ms. Valdez-Valdez I think you're going to have to grapple with that. Sean Quirk Yes, absolutely, Your Honor. Ms. Valdez-Valdez Okay. Sean Quirk And this is the technical issues that occurred, to your point, Judge Bress, about the translation error, were of the Court's own making, which is just another more Ms. Valdez-Valdez It's very concerning that the instructions weren't translated. Sean Quirk Yes. Ms. Valdez-Valdez Absolutely. But they got the witness on the phone. Sean Quirk Yes, Your Honor. Ms. Valdez-Valdez So what happens to your argument, given that they got the witness on the phone? Sean Quirk They got the witness on the phone, Your Honor, but then the evidence shows that the call dropped. The I.J. found that she was uncooperative and he construed the call dropping as her hanging up. But I'd like to point out Sean Quirk But, I mean, she wasn't that cooperative, right? Sean Quirk I don't think there's evidence, Your Honor, of her being uncooperative. There's evidence of translation issues. I believe there were about 70 or so untranslated marks in the transcript. Sean Quirk So wasn't that because she was talking really fast and was told not to do that? Sean Quirk It does appear that she was talking too quickly, Your Honor. But it was, there's no evidence of her being uncooperative in the sense of not asking or answering the I.J.'s questions. I'd point the court to AR 198, which is the critical point in which the call drops. She says, quote, I have to step out of the house, end quote, and that was due to apparent background noise. The I.J. asks her, who are you talking to? Are you talking to me? So there's apparent background noise. She says she's going to step out of the house and she says, quote, I'm going to go ahead and answer you from the outside. She provides one answer to the question about why the petitioner would still be subject to torture despite Colonel Ramos's death. Then the call drops. The record reflects, Judge Brest, that it, that either she had a technical issue with her cell phone or she just simply lost signal because she stepped outside. The result, however, was that the I.J. completely excluded this highly corroborative, highly probative evidence because the I.J. tried to call her back. Is that really highly probative? I mean, she essentially got the gist of it and it's basically her claim was Colonel's sibling who's one who's an accountant and his wife, who's a seamstress, is somehow, you know, has friends in the police department and are going to get him killed. I mean, it seemed pretty speculative and the I.J. seems skeptical of it and says, you know, why would, and how could an accountant do this, especially when the Colonel himself is dead? Yes, Your Honor. Ms. Valdez-Valdez corroborated not only that his prosecution and his torture in prison was at the behest of Colonel Ramos, but also the assaults that occurred after he was released. So she said, quote, that Colonel Ramos sent, quote, lower ranking people, end quote, from the police force to beat him up to the I.J.'s question on this point of whether the threat still existed because Colonel Ramos has passed away. She said that the sister, Martha, and the brothers are, quote, friends of the police and they know each other, end quote. Every single time that they have any problems, they go to the police. So this is exactly the testimony that Mr. Rapaio-Castro presented, that the threat clearly remains. I do want to get to an important issue that cascaded throughout this entire proceeding and that's, of course, the lack of counsel. So, you know, had Mr. Rapaio-Castro had an attorney, he would have, he or she, the attorney would have been able to provide the, facilitate the translation of the pre-hearing statement order to get the WebEx link that was required by the court to have her testify, to facilitate her testimony, to Judge Bress's point, to instruct her that she needs to speak slowly, that the I.J. will not speak Spanish, and that there will be translation. All that did not occur because the court denied him his right to counsel. So how was this issue exhausted before the BIA? Your Honor, this issue is not subject to the normal exhaustion requirements because it arises under the Fifth Amendment due process clause for right to counsel and, of course, the statutory right of a Petitioner to have counsel in his proceedings. I think the hearing was continued three times so that he could get counsel. And initially, it indicated that he wanted counsel, that he at one point had counsel. In the last hearing, there was an express, right, the second to the last, I think the I.J. said, we're going to go forward next time if you don't have counsel. And then said at the final hearing, okay, you're here, you don't have counsel. I'm paraphrasing, but essentially asked him if he wanted to go forward without counsel, and he said, I think, unambiguously said yes. There were two, two continuances, Your Honor, and then the third time, the waivers found. I, the, we represent that this case is exactly similar to Usobekhanov, including the timeframe. Here, there are two continuances over eight weeks. In Usobekhanov, there are two continuances over seven weeks. But I think you're referring to the case where there was a change of venue, right? And there's no change of venue here. He was, he, he was moved from Arizona to the next case. I think you're analogizing to a case where it was very clear that the, when the, when the Petitioner showed up without a lawyer, that's because they were anticipating a change of venue. But in, in this case, we don't have that. In, in Usobekhanov, Your Honor, there, Mr. Usobekhanov appeared before the same IJ and asked for two continuances because he was struggling to get his, his, his attorney to appear, and then the third time was said we're proceeding without one. How about, how about with respect to the, well, go ahead and finish your point. Well, Your Honor, also, Hernandez Gill also presents a very similar situation. The Court found denial of counsel where the IJ refused to continue a hearing as the wanted the counsel to appear at the merits hearing. IJ grant the continuances, and then the last one, the petitioner didn't ask for a continuance. I don't know if it's really on point. I think in both Tawadris and Castro-Orion, I think, is highly relevant here. Because, of course, IJ found waiver at this, this third hearing. So the, the analogy for Castro-Orion, this colloquy was found to be insufficient. Quote, you are here today by yourself, that is, you don't have an attorney with you. Does that mean you intend to speak for yourself today? Answer, yes, I do. Question, all right, end quote. Here, on our record, it was the same sort of laconic answer that the Ninth Circuit has found to be insufficient. The colloquy here was, quote, I see that you're here again today without an attorney. Do you want to represent yourself now? Answer, that's right, end quote. That's not a knowing involuntary waiver. And he did continue by his actions to represent himself without further requesting counsel. Yes, Your Honor. But Tawadris requires that the, the knowing involuntary waiver be presented to the IJ, and silence is not a knowing involuntary waiver. So the fact that he did not affirmatively state at subsequent hearings that he still wanted an attorney is insufficient to find, to find waiver. And how do you want to? What I was also wondering is how was this properly exhausted before the BIA? I would, two points, Your Honor, on the exhaustion point. One is that because it's a constitutional issue, JEFM v. Lynch says that it's not subject to the same requirements for exhaustion because it's a constitutional issue. And then secondly. Well, hold on a second there. I mean, how broad is that, that any constitutional issue? I think the denial of counsel, the right to counsel, Your Honor, is unique. It presents a certain irony here, which goes to the second point, that not only is it constitutional, but it is impossible to exhaust without counsel. The right exists. Well, I'm not, I'm not sure about that. Why couldn't he have put in his notice of appeal, I was wrongly denied the right, my counsel? He wasn't represented before the BIA by counsel, Your Honor, and so the right exists that a petitioner has counsel to navigate exactly this kind of legal obligation. It's. Didn't accept any waiver of counsel unless the petitioner is represented by counsel when he waives counsel? The, the, the fact that he did not have an attorney before the BIA inhibited his ability to articulate. I appreciate that, but my question really was a yes or a no, and I want to make sure I'm following your punchline. Yep. Where it leads. Sorry. And it sounds to me like what you're saying is if somebody's unrepresented when they waive counsel, then that's per se not a valid waiver of counsel. I, my point, Your Honor, is more to the exhaustion, to the, to the BIA. There can be a knowing involuntary waiver if the implications of the waiver are not are, are clearly articulated, which is what to Tawadrous requires. So there needs to be an, the IJ needs to find a knowing involuntary waiver, and so that, of course, can be done pro se. Here, that short, laconic answer is insufficient under Castro-Orion and under Tawadrous. But let me just make sure I understand. So, so I think I'm following you, but as a, as a case law matter, have we ever said that if somebody is in front of the IJ and they don't have counsel and they've raised this issue before the IJ and, and they're, you know, they then have to proceed pro se, and they go to the BIA and they don't raise the counsel issue in front of the BIA, that they can nonetheless come here and raise that issue? Because the BIA didn't, didn't touch this issue at all because it wasn't raised. It's a really interesting point, Your Honor, and there's obviously an, an irony here. The, the answer in the case law, so for Tawadrous, Hernandez-Gill, Rios-Barreros, and Usobekhanov, the counsel was retained before the BIA and they raised the fact that the petitioner did not have counsel before the IJ. In Castro-Orion, to, to answer your question, a petitioner lacked counsel before the BIA, and it's unclear, but it seems like it was not raised, yet the court reached the issue and we, we represent that the case is highly unpopular. Okay, but that, I mean, I'm not aware of a case that we've said that. You may be right that that should be the law, but, but I don't think we've said this before. It's, I do not think it's clearly articulated, Your Honor, but it is presented in the procedural history of certain denial of counsel cases. I would also point, aside from Castro-Orion, I'd point the court to Ram v. Mukasey, where there's no argument or, or facts about whether the, the issue was raised, but they find that there was a denial of counsel before the IJ and there's no mention of the BIA ever mentioning denial of counsel. I mean, if this is true as a matter of course, we, we see a lot of cases where somebody did not have counsel before the IJ, did not have counsel before the BIA, and then they come to us and they do have counsel, including counsel like yourself, who are kind enough to represent this client, but, but then we don't usually go around and say, well, let's now go back into the record for this, this lack of counsel issue when it wasn't even presented to the BIA. Singh v. Ashcroft says that the exhaustion requirements in, in a petition like this do not apply when it's impossible or futile. We would represent, Your Honor, that when the court appointed me counsel in this case, I was the first person to inform Mr. Appiah-Castro of his right to counsel and the denial before the agency. He was unaware of the rights that he, that he, he had and that were, were violated. And so for the court to explicitly endorse the government's position here would, as, as we said in our briefs, it's enshrining a catch-22 that just doesn't exist in the case law. And I see that I'm — Yes, Your Honor. Thank you.  You bet. Good morning. May it please the Court. Shahrzad Begay for the Attorney General. The only issue before the Court today is the agency's denial of deferral of removal under the Convention Against Torture, and the record evidence does not compel reversal of this decision. Counsel, could you speak up just a little bit? Of course. Big courtrooms, so that would help me. Of course. Did you want me to repeat what I just said? I got that part. Okay. I'm just having to lean in, so. Okay. Thank you. The record evidence does not compel reversal of the agency's denial of cat deferral in this case. The Petitioner's cat claim in this case was based on his claim that the Colonel's family would seek to, would seek to harm him upon return, and also he claims that he would be at risk of torture because of his sexual orientation and political activities. And in assessing the cat deferral claim, the agency considered all risks of harm individually and also in the aggregate. There were three independently dispositive determinations in denying the cat deferral claim. This includes the insufficient corroboration, the failure to establish a clear probability of torture, and also the failure to show that any future torture would be with the consent or acquiescence of the Peruvian government. And I will discuss each of these for the Court. The insufficient corroborations, specifically while he did provide some evidence, his evidence failed to establish or show to any capacity that the Colonel was linked to the incidents that he experienced in prison and then after his release. Specifically, he submitted a letter from his attorney in Peru. This letter, however, does not substantiate his claims of what happened in prison. I think that the corroboration is problematic for him, but what about the telephone call that dropped? Of course. I think Judge Lee's knowledge, and I think I, or I'll just speak for myself, I think to the extent she testified, she was corroborative. Well, she did provide some testimony. It was her claim that there were two members of the Colonel's family who could possibly hurt the Petitioner or seek to harm him. However, she didn't provide any more details, and she did also provide a statement which didn't really provide any information. The reason I thought it was helpful to him, I guess, was a couple, including that the person who, the Colonel, I guess, has passed away. And so one would otherwise conclude that he doesn't face any risk at all if he's returned to Peru. And she's explained that there are three brothers and so on and so forth. And that they knew the police, as the opposing counsel has summarized. And that does seem to me to be corroborative. There was certainly some evidence that she provided, but other than just the claim that they may harm him, there was nothing further that he points to that really significantly could link any future torture to the actual Colonel family members. There was just some speculation that they might harm him. Well, I think it's a little more than that. I think that the government has a pretty strong argument that we don't have a reason to think he would land back in prison. But he also alleges that these same brothers, or some combination of brothers, arranged for him to be harmed after he had been released from prison. Correct. He did make that allegation as well, but again, his evidence did not really support that. He did submit some evidence from his sisters, and there was no mention of anything about the Colonel. And the others didn't mention the Colonel, or his harm. They didn't mention anything regarding the crime or the abuse. Right. But it kind of cuts both ways. I think you're right. I don't see other corroborative evidence. So what that does, though, is it makes this one witness who was cut off that much more important. She's pretty critical to his case. And the call was dropped. So that's confounding, because on the one hand, I've already said I'm just one of three up here, but I find it very concerning that those directions weren't, about how to arrange her witness, weren't translated. Because I think everything else was translated. So that's problematic. There's a real preservation issue about whether this argument was preserved. The BIA did lean in. He didn't file a brief with the BIA. And so there are gleaning issues, I think, from a notice of appeal. Yes. I'll certainly give you that. But I don't know what to make of this transcript. I really squinted hard at it to figure out whether or not she was — did she hang up? Was she cut off? I know they tried to call back one time. But what do we do with that, given that she was so important to his case? Well, Your Honor, I understand the concern. And the record in this particular case reflects that the immigration judge did take steps to reach out to the witness. You know, as indicated in the transcript, he did try to call her. The witness did not answer. And ultimately, there's no indication that anything that — and she did provide some evidence, you know, in support of him. But there's nothing significant that would have really altered his case. Can you tell us anything? I didn't see anything. Forgive me for interrupting. But I didn't see anything in the record that tells us whether it's the government's routine practice to translate these for — especially for folks for whom English is a second language, if they're not, or perhaps not a language, if they don't speak English and are unrepresented. So what's the government's — what's the immigration court's practice? Well, I understand that in this particular case, there was a — there was a Spanish translator who was always available. I don't know specifically in terms of whether the English version of this document was provided to him. But it was up to him. Since he didn't have a lawyer — Right. That's why I think opposing counsels talk about — about a cascading problem. He didn't have a lawyer. We've gone over the transcript of the — he was asked if he wanted a lawyer, and there were, I think, a couple of different continuances. But on hearing number three, he goes forward. And, of course, if those directions aren't translated, having a — having a translator to translate Spanish to English, of course, is terribly helpful, but he's got to line up his witness. So that's the problem.  Is it — are those directions typically made available to people who are representing themselves so they can have their witnesses available? I believe they would be, and there's no indication in this case that it wasn't provided to him. And I think, ultimately, the fact that he didn't raise this, that that's problematic, that he didn't raise this to the board. Ultimately, this wasn't addressed by the board. If there was an issue with the document, the board could have addressed this at that level. He makes this — I think this is what Judge Bress was alluding to. The board is gleaning an argument and has exhausted something, as Judge Bress put it. And I think it's the argument that his witness, really his primary witness, was improperly excluded. The question is sort of how much do we pack into that, right? Right. And they got her on the phone, then there was this dropped call, for whatever reason, dropped or hung up or whatever, an attempt to call back. So what's your best argument that we shouldn't — we should not consider this argument in support of his — the issue that he did raise to be unexhausted? In other words, it seems to me part and parcel, and I just wanted to hear your response to that. I'm sorry, Your Honor, your question is why should it be considered unexhausted? I do not — I don't know how you could possibly have gleaned a question out of what I just said. So here, let me just try it again. No, no. The thing he — the issue that he preserved is, hey, you improperly excluded my witness, right? And part of that, it seems to me, is that when the call dropped, because I didn't have these directions translated, I couldn't get her — couldn't get her back. So has he fairly exhausted this issue about the untranslated instructions? I don't believe so. In his notice of appeal, I don't believe that that was — I mean, there's nothing specifically that was raised regarding that or anything that would just generally refer to any issue. Is there anything to indicate that the BIA recognized this issue? I don't read the BIA's decision as recognizing the issue to any extent. And just the fact that the transcript of all the hearings indicate that there was a Spanish translator, there was no issues with him understanding what was being provided to him, any instructions, at no point did he indicate that he had any trouble understanding anything that he was provided. So there's — The I.J. thought the witness was uncooperative, and there's certainly a transcript that indicates many passages weren't translated, and there are times when they ask her to slow down because of what the translator did anyway. Correct. And I think the I.J. did at one point because he couldn't keep up with her. Are there — is there anything else other than her speaking really fast, apparently too fast, to indicate that she was uncooperative? Well, mainly the fact that the I.J. at some point did let her know as well that, you know, they would not be able to continue the hearing, and she indicated that she understood. So I think basically she was given several opportunities. Ultimately, she dropped the call, and then the I.J. followed up with the call. I don't know if she dropped the call. I can't tell, but the call dropped. I know that. I just can't tell if she hung up or if it dropped. I was just trying to get at whether or not she did anything else that could be deemed fairly described as uncooperative, like not answering the question that was asked or something along those lines. What I see in the record is that she just kept talking really fast. Is there anything else? I think ultimately the last part, right before the call dropped, you know, she was asked several times why would the family of the colonel pursue anything, you know, the colonel is dead, and there was not really much response. So it just seems like they were trying to get more information about this claim of how the family members and why they would be interested, and there just didn't seem to be any substantive response based on the record. Excuse me. Do you have any other questions? I was going to ask about the counsel issue and exhaustion. So how should the law work in a case like this where somebody didn't have counsel in the IJ, they then don't raise that issue in front of the BIA, and then they come here and do raise that issue? Are there circumstances under which that would be exhausted, or is it never exhausted? How does the government see that? Well, this is a due process claim regarding an issue that the board could have addressed. It's a procedural issue that could have been addressed by the board and corrected at that level, and it should have been raised at that level. And if, in this particular case, if you look at the entire record, it reflects that he was given, you know, multiple opportunities if he wanted to seek counsel. There's no indication that he was deprived of this opportunity or brought this to the attention of the immigration judge. So Mr. Quirk would say, or he did say that, you know, his client did not understand this counsel issue, so there was no ability really for him to raise it in front of the BIA either. Have you addressed that? Well, in the record, it reflects that the immigration judge expressly asked him, you know, do you waive your right to counsel? And he said yes, and he was given the chance to ask for further time. He never did. If there had been any indication in the record that there was any problem with him obtaining counsel or that he required more time, perhaps it would be a different situation. But just the fact that he had a translator, he indicated that he understood everything at all points and was given opportunity every single time that he required it to explore the attorney. And I think at some point he did actually have representation for filing the asylum application in this case. So there's, it seems to be a murky area because it seems that he did have some assistance and he indicated, you know, I do have legal counsel who didn't actually enter appearance. So it's a little bit unclear if he actually did have assistance here. So is it your position in evaluating the exhaustion issue that what we ought to do is go back to the record and try to make an evaluation of essentially how knowing the counsel waiver was? And if we think it's sufficiently knowing, then he really had an obligation to raise it in front of the BIA. And if we think there was just not enough in there to make it knowing, then maybe he didn't? That would be the position. First and foremost is the fact that this is a procedural due process issue that the board should have addressed and could have addressed if it was raised properly. But the second point would be that, yes, if there was any indication in the record that there was a problem, then that could perhaps be the next level of review. If there was an issue with representation and seeking representation at that point. Sotomayor, any other questions? So I don't think we have any other questions. Do you want to wrap up your remarks? Sure, of course. So, Your Honors, there's no record evidence that would compel reversal of the agency's denial of cat deferral in this case based on insufficient corroboration as well as the absence of any indication that there's a clear probability of torture. As mentioned, the Colonel has passed. There's no indication that there's any threat. It's been 20 years since they've had any interaction with the Colonel's family members. There's also been no indication that there's any link between his experiences and the Colonel's family members. Specifically, they've never mentioned the incidents that the incidents were linked to the Colonel, and the victim as well was not mentioned during any of the incidents. And finally, with respect to his claim of a risk of torture based on his political activity and sexual orientation, the agency probably found that to be speculative because he hasn't shown that he would be at a particular risk of harm based on that. And if there are no further questions, thank you very much.  Madam Clerk, could you put two minutes on the clock, please? Thank you. Thank you, Your Honor. Judge Christian, just to jump in on the point about how critical Ms. Valdez was to his case, we absolutely agree that she was highly corroborative not only of the torture that occurred in prison, but of the attacks that occurred afterwards. My friend on the other side said that there's been no interaction with the family for 20 years. Of course, that's not true. The assailants were sent by the family. He was receiving death threats by men, police officers that were sent by the family. What's the most recent interaction? The most recent interaction was April 2022, a few months before he came to the United States to seek asylum, to seek refuge, and that was an assault in Juan Cayo, his hometown, after he left Lima because of two other assaults. Well, but he has a couple of different incidents where he, after he was released from prison, where he claims that he was assaulted and whatnot, and his sisters were nearby, and they did not describe it this way. I just want to be clear that I don't see corroboration there. Do you think I'm missing it? Your Honor, we think that the letters talk about his character, the letters from his sister, but they do not talk about these incidents. This is a great point at which counsel for Petitioner could have talked to the sisters. What about his counsel from Peru? He had a criminal defense attorney who chimed in here and did not mention this mistreatment in prison. Our understanding is that this is a public defender that represented him at his sentencing in Peru. There was no contact or representation since 2006 or so when he was sentenced, so she had no reason to know of anything that had happened since. Okay, so you're just coming to a—I want to make sure we give this case all the consideration it is due. So let me just tell you, I don't see any other corroboration except for this witness. Do you think I'm missing anything else? I mean, there's his written testimony, which was exactly on point with his oral testimony. The I.J. found him to be credible. The government's brief acknowledges that the corroboration requirement was under the I.J. finding him to be credible. And so Ms. Valdez-Valdez was the critical piece of the case, Your Honor. And just to conclude, I seem out of time. Castro-Orion, we again insist, is the most on point here to Judge Bress's concerns about the constitutional exhaustion issue as well. There the Court held, quote, lacking the counsel he had asked for, Castro lacked what has been said to be indispensable and missing in totalitarian countries, a clear-minded ally who knows the law. No one was there to help him tell his story. His case was seriously prejudiced by the lack of legal assistance that Congress has mandated. We represent, Your Honor, that the Board's fundamental error here was to affirm a decision in a hearing marred by denial of counsel. We ask that the Court grant Mr. Pai Castro's petition. Thank you for your arguments, both of you, and for your patience with our questions. We'll take that case under advisement. Counsel, I want to thank you also for your pro bono representation. Very helpful to the Court. We'll take that case under advisement.
judges: CHRISTEN, LEE, BRESS